IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

KIMBERLY DAY-LEWIS,                          )
9295 TOWERSIDE DRIVE, APT. 333               )
FAIRFAX, VA 22031                            )        CIVIL ACTION NO.:
               Plaintiff            )
                                            )
        v.                              )
                                            )
                                            )
U.S. EQUAL EMPLOYMENT                        )
OPPORTUNITY COMMISSION,                      )
131 MAIN STREET, NE                          )
FOURTH FLOOR, SUITE 4NW02F                   )
WASHINGTON, D.C. 20507-0100                  )
               Defendant            )

## COMPLAINT

### INTRODUCTION

1.     Kimberly G. Day-Lewis ("Day-Lewis") was employed as an ADR Mediator for the U.S. Equal Employment Opportunity Commission ("Commission" or "Defendant") as of December 8, 2008, when she received a competitive appointment to ADR Mediator, Non-Career Ladder, GS-12 Step 1, duty station Baltimore Field Office of the Philadelphia District.

2.     Day-Lewis brings this civil action pursuant to Title VII of the Civil Rights Act of 1964, the Lilly Ledbetter Fair Pay Act of 2009, the Fair Labor Standards Act, the Age Discrimination in Employment Act, the Equal Pay Act of 1963, and the Civil Service Reform Act.

3.     Defendant's agents from the time of her initial appointment through her last day of employment with the Commission, engaged in a continuing course of discriminatory conduct

against her on the bases of her race (African American), color (medium brown), age (50 at the time of the first acts of discrimination, now 53), and sex (female).

4.      Defendant's agents engaged in a continuing course of antagonistic and adverse employment actions (including actions to downgrade and undermine Day-Lewis' performance rating) in retaliation for her complaining about the delay in her Career Ladder Promotion, alleging unjust and discriminatory compensation and other terms and conditions of employment, alleging misconduct in the discrimination complaint process and otherwise engaging in protected activity under the Fair Labor Standards Act, the Equal Pay Act of 1963, Title VII of the Civil Rights Act of 1964, the Lilly Ledbetter Fair Pay Act of 2009, the Age Discrimination in Employment Act, and the Civil Service Reform Act.

5.      Defendant's conduct placed her at a disadvantage relative to other ADR Mediators.  Such conduct adversely affected several aspects of her terms and conditions of employment including compensation (grade, salary and benefits), duty station, job assignments, professional development, opportunities for lateral movement to other occupations within the Commission, opportunities for merit promotion to higher grades within and outside of the Commission, and ability to balance work and life responsibilities.

6.      Defendant's course of conduct abrogated federal public policies as set forth in the Merit System Principles: (1) providing all employees fair and equitable treatment in all aspects of personnel management without regard to race, color, age or sex; (2) providing equal pay for work of equal value; (3) selecting and advancing employees solely on the basis of relative ability, knowledge, and skills after fair and open competition; and (4) making efforts to achieve a workforce from all segments of society.

7.     Defendant's agents with authority over personnel actions perpetrated prohibited personnel practices against her, including but not limited to (1) deceiving and/or obstructing Day-Lewis from competing for employment; (2) giving favored employees (not members of the protected class) unauthorized preferences or advantages in obtaining positions; and (3) retaliating against Day-Lewis for complaining about Defendant's practices.

8.     Due to the structural conflict of interest built into the discrimination complaint process, Defendant's agents inflict on Day-Lewis, the very conduct against which it institutes enforcement actions against other employers.  Defendant's agents willfully disregarded law, regulations, public policy, and Commission policies.

9.     Since Defendant's agents are the counselors, investigators and arbiters of complaint dismissals and appeals, and Defendant's managers and other agents engaged in conduct that destroyed the integrity of Day-Lewis' discrimination complaint processes under Agency Nos. 2010-00036 and 2011-33814, Day-Lewis is left with no other recourse but to seek redress from the Court.

10.     Defendant violated and continues to violate her constitutional right as a federal employee to equal protection under the Civil Service Reform Act, Title VII, the Fair Labor Standards Act and other laws, including the apparent corruption in and untrustworthiness of Defendant's discrimination complaint process.

## JURISDICTION

11.     This Court has jurisdiction over the subject matter of this civil action pursuant to 28 U.S.C. §1331.  This action is authorized and instituted pursuant to 42 U.S.C. §2000e *et seq.*, the Lilly Ledbetter Fair Pay Act of 2009, 29 U.S.C. § 206d, 29 U.S.C. § 621 *et seq.*, and 5 U.S.C. §§ 2301(b); 2302(b).  Day-Lewis timely files this complaint after waiting more than 180 days

(since October 15, 2010) for the EEOC Office of Federal Operations to render a decision in her appeal in EEO No. 2010-00036, and waiting more than 180 days (since July 18, 2011) for the Agency to issue a Final Agency Decision in EEO No. 2011-33814, thereby exhausting her administrative remedies as required pursuant to 29 C.F.R. § 1614 *et seq.*

## VENUE

12.     Venue is proper in this judicial district because it is the judicial district in which the Defendant resides, and/or the judicial district in which a substantial part of the events or omissions (i.e., Defendant's discrimination with respect to Day-Lewis' employment with the Commission) giving rise to Day-Lewis' claims occurred.

## PARTIES

13.     Day-Lewis is an African American, medium brown skin color, female, age 53, resident of Virginia and United States citizen. She is an attorney licensed in the Commonwealth of Pennsylvania since November 1983, and a former resident of the Commonwealth of Pennsylvania for over 20 years. From December 8, 2008 through March 10, 2012, Day-Lewis was employed as an ADR Mediator with the Defendant, first in the Baltimore Field Office of the Philadelphia District and later in the Raleigh Area Office of the Charlotte District.

14.     Jacqueline A. Berrien, Chair of the United States Equal Employment Opportunity Commission, is the head and named representative of the agency of the United States Federal Government that employed Day-Lewis.

## STATEMENT OF FACTS

Day-Lewis' Education and Employment Law Experience

15.     In June 1980, Day-Lewis received an A.B. Degree in History from Brown University. In May 1983, she received a J.D. Degree from the University of Pennsylvania Law

4

School. On November 21, 1983, Day-Lewis was admitted to the Bar of the Supreme Court of the Commonwealth of Pennsylvania and has been a member of this Bar in good standing since her admission. In May 1998, Day-Lewis received a M.A. Degree in Clinical/Community Counseling from Eastern College (now Eastern University) and a M.T.S. Degree Counseling concentration from Eastern Baptist Theological Seminary (now Palmer Theological Seminary of Eastern University).

16.     Day-Lewis began law practice in 1983, and beginning in 1990 practiced in the Labor and Employment Group of PECO Energy Company as assistant general counsel. Day-Lewis practiced employment law until December 2008, when she began working for Defendant as an ADR Mediator.

Day-Lewis' Employment Mediation Training and Expertise

17.     In 1996, at her expense, Day-Lewis took Basic Mediation from the Conflict Resolution Program of the Philadelphia Yearly Meeting. Eugene Weaver, then ADR Coordinator for the Philadelphia District ("Weaver") (now retired), also attended this training program.

18.     After receiving basic mediation training, Day-Lewis was persistent in finding opportunities to mediate employment cases. She contacted Weaver multiple times in 1997, 1998, and 1999 for opportunities to mediate for the EEOC Mediation Program.

19.     Weaver gave Day-Lewis a few opportunities to co-mediate federal sector employment cases with Stanley Braverman ("Braverman") (then an attorney with a federal agency) and private sector employment cases with himself.

20.     In 1999, Day-Lewis began a solo practice to concentrate on workplace and organizational issues that enabled her to blend her knowledge, skills and experience in

5

employment law, counseling psychology, professional ethics, and dispute resolution. Employment mediation fit her practice objective.

21.　In November 1999, Braverman, then an EEOC ADR Mediator (later, Deputy Director of the Philadelphia District) helped Day-Lewis become a regular pro bono mediator for the Philadelphia District Office. Monthly, Weaver assigned Day-Lewis private sector cases as sole mediator.

22.　In 2001, Day-Lewis applied for and was selected by Weaver to receive a four-year contract (renewed annually) to mediate private sector cases for Defendant's Philadelphia District Mediation Program (the "Mediation Program").

23.　As she gained experience in employment mediation, Day-Lewis became more active in Alternative Dispute Resolution professional associations and volunteer activities. Her activities included membership in the American Bar Association Dispute Resolution Section, the Philadelphia Bar Association Dispute Resolution Section, and membership on the Board of Directors of the Pennsylvania Council of Mediators. For a time, Day-Lewis participated in a peer mediation support group sponsored by the Friends Conflict Resolution Program.

24.　Day-Lewis spent considerable time, money and effort attending local and National ADR conferences, planning local conferences, and serving as course planner and faculty for continuing education seminars on mediation. In April and August 2002, Day-Lewis served as course planner and faculty for a continuing legal education program sponsored by the Pennsylvania Bar Institute ("PBI") that featured the Mediation Program with Weaver as a panel member.

25.　In 2003, in order to get additional experience in employment mediation, Day-Lewis traveled to Newark, NJ, at her expense, to mediate cases in the Newark Area Office. Phil

Goldman ("Goldman") was ADR Mediator in the Newark office. Goldman assigned Day-Lewis cases.

26.     In August 2003, Day-Lewis relocated from Philadelphia, first to Rhode Island in October 2003, and then to North Carolina in April 2004.

27.     Although, Day-Lewis now lived a considerable distance from Philadelphia, she continued to have significant business, professional and social ties in Philadelphia. Therefore, Day-Lewis traveled back to the area often for her practice. Her business travel to Philadelphia included mediations for the Mediation Program.

28.     By 2005, Day-Lewis had completed in excess of 100 hours of mediation training, and had conducted more than enough employment mediations to receive Advanced Practitioner Workplace Mediation designation by the Workplace Section of the Association for Conflict Resolution ("ACR"). Goldman wrote one of the references Day-Lewis needed to complete her application for the Advanced Practitioner designation.

29.     Day-Lewis has continuously held ACR's Advanced Practitioner Workplace Mediation designation since 2005.

30.     When the Mediation Program contract process opened in 2006, Goldman was ADR Coordinator for the Philadelphia District. From his experience with Day-Lewis in Newark and Philadelphia, Goldman selected Day-Lewis as a Philadelphia District mediation contract panel member for a four-year period (renewable annually) and assigned her cases.

31.     In addition to the Mediation Program contract, Day-Lewis had employment mediation contracts with other entities including the U.S. Postal Service REDRESS Program and private dispute resolution firms. In fall 2008, Day-Lewis, already a member of the American

Arbitration Association Employment Arbitration Panel, was accepted as a panel member for the American Arbitration Association Mediation Panel.

32.    By October 2008, Day-Lewis had nearly 18 years of employment discrimination law experience and nearly 9 years of employment mediation experience. Day-Lewis had recognized expertise in employment mediation.

33.    Under U.S. Office of Personnel Management ("OPM") qualification standards, Day-Lewis had sufficient relevant advanced education and work experience in employment discrimination law and employment mediation to meet the standard for performing duties for a year or more equivalent to GS-0301-14 ADR Mediator.

Day-Lewis' Opportunities for Employment-At-Will in 2008

34.    By 2008, Day-Lewis had spent almost ten years as an independent consultant with (among other subject areas) a concentration in employment dispute resolution. She sought stable work consistent with her expertise in dispute resolution and workplace matters.

35.    Goldman and Day-Lewis had one or more conversations during the year wherein Day-Lewis made her interest in potential Mediator vacancies known to Goldman.

36.    In September/October 2008, Day-Lewis was invited to apply for senior level positions with two religious organizations, one of which was located in Philadelphia. At this time, the Federal Emergency Management Agency of the Department of Homeland Security had offered Day-Lewis assignment with its ADR Cadre. Day-Lewis was also a candidate for Princeton University's Ombudsman vacancy.

37.    During this September/October 2008 period, Goldman informed Day-Lewis there was a vacancy in the Mediation Unit in the Baltimore Field Office that would soon post on USA

Jobs. Day-Lewis applied for the position when it posted, and Goldman notified her of his selection in mid-November 2008.

Day-Lewis Questions Goldman About the GS-12 Grade

38.     Day-Lewis alleges that all of Goldman's representations, acts and/or omissions hereinafter alleged in this Complaint were performed in the course and scope of his employment with the Commission.

39.     In Day-Lewis' conversation with Goldman concerning the ADR Mediator job offer ("Job Offer Conversation"), Day-Lewis questioned Goldman about the grade level of the position. She noticed the position was posted GS-12 when she knew the ADR Mediators in the Philadelphia District were appointed GS-13, and former Supervisory ADR Mediators (Baltimore and Cleveland) retained their GS-14 grades. Day-Lewis asked Goldman whether the position had been downgraded.

40.     Goldman answered Day-Lewis with false and/or misleading statements, and incomplete information that gave Day-Lewis the impression he had no discretion in setting the grade of the Baltimore Mediator position, ADR Mediator had been downgraded to GS-12, and the downgrade may be temporary.

41.     Goldman stated Nick Inzeo ("Inzeo"), Director of the Office of Field Programs ("OFP"), required him to post the Baltimore ADR Mediator vacancy at GS-12. Therefore he lacked discretion to post the vacancy at GS-13. Goldman stated ADR Mediator was undergoing a classification review, he believed the appropriate classification to be GS-13, and that the review would confirm his belief. Goldman stated he did not know when the study would be completed.

42.     In March 2010, Day-Lewis discovered Goldman's statements concerning his lack of discretion to post the ADR Mediator vacancy at GS-13 to be false, misleading and/or

9

incomplete information.   Day-Lewis learned the following information from separate conversations with Levi Morrow, Chief Negotiator, National Council of EEOC Locals 216, and Erica White-Dunston, former Acting Assistant Director, Office of Equal Opportunity: (1) the GS-12 ADR Mediator position was created as a lateral opportunity for EEOC Investigators with 10 years or more experience to change occupations within the Commission; (2) GS-12 ADR Mediator position was for a novice whereas the GS-13 ADR Mediator position was for a candidate who had experience mediating; (3) District Directors had discretion to recommend an ADR Mediator vacancy be filled at GS-13; and (4) Headquarters followed the District Director's recommendation.

43.   In accordance with Day-Lewis' information and belief, Goldman, with the delegated hiring authority of District Director Marie Tomasso, did not recommend Headquarters approve the Baltimore ADR Mediator vacancy as GS-13.

44.   In the Job Offer Conversation, Day-Lewis asked Goldman whether she could be appointed at GS-13, given her credentials.

45.   Goldman answered Day-Lewis with false and/or misleading statements.   He stated he did not have discretion to appoint her to the higher grade.

46.   In March 2010, in a conversation with Brian Nelson (Caucasian, male) ("Nelson"), an ADR Mediator GS-13 in the Los Angeles District, Day-Lewis learned Goldman's denial of discretion to appoint Day-Lewis at GS-13 despite the GS-12 posting, was false and/or misleading.

47.   The Los Angeles District posted two ADR Mediator vacancies some time after the Baltimore ADR Mediator posting.   The Los Angeles vacancies were posted as GS-12. Nelson (former Supervisory Investigator GS-13) was selected for one of the vacancies. The Los

Angeles District was allowed to appoint Nelson as an ADR Mediator GS-13, despite the GS-12 posting and despite Nelson being a novice mediator.

48.     In the Job Offer Conversation, Goldman did not inform Day-Lewis that the ADR Mediator GS-12 position was Non-Career Ladder, meaning there was no promotion potential.

49.     Goldman not only failed to inform Day-Lewis of the Non-Career Ladder status of her position, but also withheld from her documents he was legally required to give her when she reported for duty in December 2008.

50.     The ADR Mediator positions (GS-12 and GS-13) are bargaining unit positions, represented by the AFGE National Council of EEOC Locals No. 216.

51.     Goldman was required to give Day-Lewis the "Memorandum dated April 4, 2001 from Ida L. Castro, Chairwoman, to District Directors, ADR Coordinators and ADR Mediators, regarding ADR Mediator Promotions," "Memorandum of Understanding Between the National Council of EEOC Locals No. 216 and the Equal Employment Opportunity Commission Regarding Promotion of GS-12 Mediators to GS-13 Mediators," and the Position Description for GS-13 Mediators.

52.     Due to Goldman's failure to fulfill his legal duty to provide Day-Lewis complete and accurate information concerning her appointment, Day-Lewis was deprived of material documents explaining the status of an ADR Mediator GS-12 as Non-Career Ladder with no promotion potential, the difference between GS-12 ADR Mediator (novice) and GS-13 ADR Mediator (expert), and the necessity of competing for a GS-13 vacancy in order to receive a GS-13 appointment.

53.     Due to Goldman's failure to fulfill his legal duty to provide Day-Lewis complete and accurate information concerning her appointment, Day-Lewis was deprived of understanding the context of the classification review.

54.     After repeated attempts over a period of months to obtain the aforementioned documents, Day-Lewis received a copy from another ADR Mediator in late November 2010, nearly two years after she started working for Defendant.

55.     In the Job Offer Conversation, Goldman discounted Day-Lewis' advanced education and the relevance of her higher education to her grade classification and salary. Goldman stated, since such credentials were not requirements for the position, having the credentials did not help in qualifying for appointment to a higher grade or increased pay as ADR Mediator.

56.     In February 2010, March/April 2010 and November 2010, Day-Lewis discovered Goldman's statements concerning the relevance of her advanced education to her appropriate grade classification were false and/or misleading.

57.     In February 2010, Day-Lewis learned the grades of two recently hired male attorneys (one Caucasian, one East Indian) in the Baltimore Field Office were changed from GS-12 to GS-13 within weeks of their hire.

58.     In November/December 2010, Day-Lewis learned the Merit System Principles require fair and equitable treatment in all aspects of personnel management without regard to race, color, sex, age and other characteristics.

59.     Goldman's failure to recommend posting the Baltimore ADR Mediator vacancy at GS-13, appointing Day-Lewis at GS-12 despite her qualifying for a Non-Supervisory ADR Mediator at GS-13, providing Day-Lewis false and/or misleading information, and withholding

material information and documentation to which Day-Lewis was legally entitled are actions inconsistent with fair and equitable treatment, may constitute prohibited personnel practices, and support inference of discriminatory motive.

Goldman's Diminishing Day-Lewis' Attorney Qualifications Is Pretext for Discrimination

60.     In November 2009, Stephanie Marino (Caucasian, 10 or more years younger than Day-Lewis) ("Marino"), Trial Attorney (Grade Unknown) was selected to be Supervisory ADR Mediator/ADR Coordinator for the Philadelphia District.

61.     No interviews were conducted in the selection process.

62.     In accordance with Day-Lewis' information and belief, Marino had never been an ADR Mediator, had never been trained in mediation, and had never conducted a mediation session prior to her selection.

63.     By selecting Marino for the Supervisory ADR Mediator/ADR Coordinator for the Philadelphia District, Goldman, in concert with and/or with delegated authority from Marie Tomasso, then District Director ("Tomasso") purportedly deemed Marino's legal education and employment discrimination law experience to be sufficient to qualify her to be a GS-14 ADR Mediator and supervisor of all the ADR Mediators in the Philadelphia District, but did not deem Day-Lewis' superior education and experience sufficient to qualify Day-Lewis for the position

64.     By selecting Marino for the Supervisory ADR Mediator/ADR Coordinator for the Philadelphia District, Goldman, in concert with and/or with Tomasso, deemed Marino not only qualified to supervise all of the ADR Mediators, but also deemed Marino the best candidate for the position over Day-Lewis, an employment law attorney, expert mediator and former conflict resolution instructor.

65.    In March/April 2010, Day-Lewis learned Goldman accepted Cecile Quinlan (Caucasian) ("Quinlan") GS-14 Trial Attorney, for assignment to the Baltimore Field Office Mediation Unit on or about April/May 2008, with the intention to have her fill the Baltimore ADR Mediator vacancy.  Day-Lewis also learned that Goldman, around the same April/May 2008 time period, accepted Cynthia Locke (Caucasian) ("Locke"), GS-14 Trial Attorney, for detail assignment to the Philadelphia Mediation Unit.

66.    In accordance with Day-Lewis' information and belief, neither Quinlan nor Locke had any prior training and experience as employment mediators.

67.    Goldman's selection of Marino to be the Supervisory ADR Mediator at GS-14 despite her inexperience as a mediator, and his acceptance of Quinlan and Locke for assignment to the Mediation Units in Baltimore and Philadelphia, respectively, demonstrated that Goldman purportedly considered legal education and employment discrimination law practice experience to be significant in qualifying an ADR Mediator at grades GS-13 and GS-14.

68.    The prior incumbent of the Baltimore Field Office ADR Mediator position had also been a GS-14.  The prior incumbent was Caucasian.

69.    Goldman was aware the level of work in the Baltimore Field Office Mediation Unit supported two ADR Mediators with mediation expertise.

70.    Goldman treated Day-Lewis less favorably than he treated Marino, Quinlan and Locke regarding the significance of her legal education and employment discrimination law practice experience.  Goldman diminished these factors when he appointed Day-Lewis ADR Mediator GS-12, a grade level significantly below her qualifications, a grade level below the work available in the Baltimore Field Office Mediation Unit, and one or more grade levels below Marino, Locke and Quinlan.

14

71.     By appointing Day-Lewis at a grade level below her qualifications for Non-Supervisory ADR Mediator, Goldman treated Day-Lewis unfavorably despite her known mediation expertise.

72.     Despite their respective lack of mediator expertise, Goldman gave Marino, Quinlan and Locke preferential treatment with respect to their assignments and appointments to the Mediation Unit. They qualified to be ADR Mediators at grades GS-13 or GS-14 solely on the bases of their legal education and employment discrimination law experience.

73.     Goldman's unfavorable treatment of Day-Lewis and his preferential treatment of Marino, Locke and Quinlan are actions inconsistent with the Merit System Principle requiring fair and equitable treatment of Day-Lewis in all aspects of personnel management without regard to race, color and age, may constitute prohibited personnel practices, and support inference of discriminatory motive.

74.     If Goldman had acted in a manner consistent with Merit System Principles and federal personnel policy, Goldman would have initially, at a minimum, appointed Day-Lewis at GS-13, the highest authorized grade level for a Non-Supervisory ADR Mediator, and the grade level consistent with Day-Lewis' relevant qualifications and known employment mediation expertise.

Goldman Prevaricates About His Pay-Setting Authority

75.     In the Job Offer Conversation, Day-Lewis also asked Goldman whether, in the alternative, Goldman could appoint her at a GS-12 Step higher than Step 1.

76.     Goldman answered Day-Lewis with a false and/or misleading statement. Goldman stated that since the position was not posted with special appointment authority, he legally could not set her compensation higher and was required to appoint her at GS-12 Step 1.

77.     In early 2011, Day-Lewis discovered OPM January 2008 Human Resources Flexibilities and Authorities in the Federal Government, "Superior Qualifications and Special Needs Pay-Setting Authority and Special Qualifications Appointments." This OPM compensation policy gives agencies discretion, without special appointment authority, to set the rate of basic pay for a newly appointed civilian employee at a rate above the minimum rate of the GS grade because the candidate has superior qualifications.

78.     The Commission's Recruitment Guidance (Memorandum from Arlethia D. Monroe, Assistant Director, EEOC Office of Human Resources dated November 19, 2007) confirms the availability of this special pay-setting authority to EEOC hiring officials.

79.     Goldman gave Day-Lewis false and/or misleading information. Goldman had pay-setting authority to appoint Day-Lewis to a Step above GS-12 Step 1.

80.     Day-Lewis' law degree, master level degrees in counseling, years of practice in employment discrimination law, and nine years of experience as an employment mediator would constitute superior qualifications for a non-supervisory ADR Mediator position at either GS-12 or GS-13.

81.     If Goldman had acted in a manner consistent with Merit System Principles and federal personnel policy, Goldman would have appointed Day-Lewis GS-13, at a minimum, at a Step above Step 1.

Goldman Provides False Information Concerning Credit for Non-Federal Service for Purposes of Accrued Annual Leave

82.     In the Job Offer Conversation, Day-Lewis also asked Goldman whether she could accrue annual leave at a level higher than the entry level of four hours per pay period.

83.     Goldman answered Day-Lewis with a false and/or misleading statement. Goldman told her he could not increase the annual leave accrual rate.

16

84.     Day-Lewis learned this statement was false and/or misleading when she discovered 5 C.F.R. § 630.205 *Credit for Prior Work Experience and Experience in a Uniformed Service for Determining Annual Leave Accrual Rate.* This federal regulation authorizes the head of an agency (or designee) to provide a new civilian appointee credit for prior related work experience or military service for purposes of annual leave accrual.

Goldman Prevaricates About the Philadelphia ADR Mediator Vacancy

85.     In the Job Offer Conversation, Day-Lewis also asked Goldman whether he anticipated any GS-13 ADR Mediator vacancies.

86.     Goldman answered Day-Lewis with a false and/or misleading statement. Goldman told Day-Lewis that given Inzeo's requirement to post ADR Mediator positions at GS-12, he did not anticipate any GS-13 ADR Mediator vacancies.

87.     During Day-Lewis' first week on the job, contrary to his representation to Day-Lewis, Goldman posted a GS-13 ADR Mediator vacancy in Philadelphia. Locke was selected for the position.

Day-Lewis' Trust of Goldman and Reliance on his Misrepresentations

88.     Day-Lewis had no reason to suspect Goldman was prevaricating and misleading. Day-Lewis had no reason to believe Goldman would perpetrate actions that deprived her of fair and equitable compensation consistent with her qualifications. Day-Lewis trusted Goldman, did not suspect that his actions deprived her of receiving equal pay for work of equal value relative to Pat Folino ("Folino") (Caucasian) and Locke, the other Non-Supervisory ADR Mediators Goldman appointed during his tenure as ADR Coordinator.

89.     At the time of the Job Offer Conversation and with the limited information she had, Day-Lewis weighed her other opportunities, and decided to accept the ADR Mediator

17

position. Day-Lewis believed it would be in her best interest to work with an entity with which she had history, to have a supervisor she knew and trusted, and to do work she knew she performed well and loved. Relying on Goldman's representations, Day-Lewis accepted the position with Defendant, resigned from FEMA's ADR Cadre before she had an opportunity to start, and withdrew from consideration for the Princeton Ombudsman position and the positions with the two religious organizations.

90.     Goldman's material misrepresentations and omissions deprived Day-Lewis of making an informed decision concerning her job opportunities.

Goldman's Pre-selection of Locke for GS-13 ADR Mediator and Providing Locke More Favorable Employment Terms and Conditions

91.     Goldman's acceptance of Locke for a position with the Philadelphia Mediation Unit indicates Goldman, in concert with and/or with delegated hiring authority from Tomasso, pre-selected Locke for the GS-13 Philadelphia ADR Mediator vacancy. Specifically, upon information and belief, Goldman and/or Tomasso pre-selected Locke for the Philadelphia Mediation Unit to provide Locke with an escape from the Legal Unit.

92.     Philadelphia ADR Mediators conduct far fewer mediation sessions than their colleagues in other offices within the District as well as compared to other Districts around the country.

93.     Locke became the third ADR Mediator in the Philadelphia Mediation Unit.

94.     Upon information and belief, District Directors anticipated loss of contract mediator funds and implementation of substantially increased mediation resolution goals.

95.     Goldman provided Locke with a job wherein she would conduct far fewer mediation sessions than her colleagues in the other offices consistent with Philadelphia Mediation Unit practice. Further, as the third mediator, she would mitigate any increased

Mediation Unit workload anticipated from contract mediator fund losses and increases in mediation resolution goals.

96.      While Goldman provided Locke with a route to an easier job, Goldman exhorted Day-Lewis and Denise Bean (African-American, female, over age 50) ("Bean"), her colleague mediator in Baltimore, to increase their combined scheduled sessions to 40 per month.  At a then current average of 25 mediations per month, Day-Lewis and her colleague were already conducting two or three times more mediation sessions than Locke, Folino, and Rob Smith (African-American, male) ("Smith"), the other Philadelphia mediators.  Goldman pushed Day-Lewis and Bean to increase their workload while he assured a light workload for Locke, Folino and Smith.

Pre-Selecting Locke is Inconsistent with Merit System Principle of Selection Solely on the Basis of Relative Ability, Knowledge and Skills After Fair and Open Competition.

97.      Providing Locke a detail for several months in the Philadelphia Mediation Unit, posting a GS-13 ADR Mediator position in Philadelphia after his previous perfidy to Day-Lewis concerning the availability of a GS-13 ADR Mediator position, and then selecting Locke as the successful candidate demonstrates Goldman and Tomasso's favoritism for Locke and deliberate disadvantage of Day-Lewis.  Giving favoritism to one employee to the detriment of another is inconsistent with the merit system principle of selecting employees solely on the basis of relative ability, knowledge and skills, after fair and open competition, may constitute a prohibited personnel practice, and supports inference of discriminatory motive.

District Resource Manager Discouraged Day-Lewis from Applying for the GS-13 Philadelphia ADR Mediator Vacancy.

98.      During her first week on the job, Day-Lewis discovered the Philadelphia ADR Mediator GS-13 posting – the position that ultimately was awarded to Locke.

99. Day-Lewis called Catherine Steffler ("Steffler"), District Resource Manager, and inquired about the position. Steffler told Day-Lewis that although she could submit an application, such action would be fruitless. Steffler explained that since Day-Lewis had just accepted a position in Baltimore as ADR Mediator GS-12, it was unlikely she would be considered to fill the Philadelphia vacancy. Day-Lewis also called Goldman who said that he was surprised Inzeo approved the posting.

100. Day-Lewis did not apply for the GS-13 ADR Mediator position in Philadelphia because she believed and relied on Steffler's representation that it would be fruitless.

Goldman's Failure to Provide Day-Lewis Material Information to which She was Legally Entitled Deceived and Obstructed Day-Lewis from Competing With Locke.

101. Goldman's failure to provide Day-Lewis with the documents referenced in Paragraph 51 prevented Day-Lewis from knowing she should apply for the Philadelphia ADR Mediator vacancy to have any immediate chance of appointment to GS-13 ADR Mediator.

102. Goldman's failure to provide the information constituted deception.

103. Goldman's deception and Steffler's discouragement obstructed Day-Lewis from entering the competition with Locke for the Philadelphia ADR Mediator GS-13 vacancy.

104. Goldman's deception and obstruction of Day-Lewis from entering the competition and his pre-selection of Locke prevented fair and open competition. Goldman's actions are inconsistent with Merit System Principles and may constitute prohibited personnel practices.

Goldman Gives Folino, Locke and Smith Advantages Unavailable to Day-Lewis; Day-Lewis Disadvantaged and Receives Unequal Pay for Equal Work.

105. The complexity of the mediation cases assigned to Day-Lewis in Baltimore was equal to or exceeded the complexity of the cases assigned to Locke, Folino and Smith in

Philadelphia. The level of mediation expertise Day-Lewis provided in Baltimore equaled or exceeded the level of mediation expertise Locke, Folino and Smith provided in Philadelphia.

106.    The number of mediation sessions Day-Lewis conducted in Baltimore exceeded the number of mediation sessions Locke, Folino and Smith conducted in Philadelphia.

107.    Since Day-Lewis, appointed at ADR Mediator GS-12, performed work that was equal to or exceeded the complexity and quantity of work performed by Locke, Folino and Smith as ADR Mediators GS-13, Day-Lewis did not receive equal pay for work of equal value.

108.    An ADR Mediator's location in the Philadelphia District Office provides advantages including, but not limited to (1) proximity and access to the District Director and Deputy Director, (2) opportunity to participate in Peer Mediation activities, (3) opportunity for external exposure such as participation as course planner and/or faculty in Pennsylvania Bar Institute continuing legal education seminars and Philadelphia Bar Association Dispute Resolution Section activities, and (4) opportunity to participate in ADR pilot projects such as federal sector mediation.

109.    Day-Lewis' location in the Baltimore Field Office was a disadvantage relative to Locke, Folino and Smith's location in the Philadelphia District Office.

110.    Day-Lewis did not have access to the District Director and Deputy Director (they rarely visited the Baltimore Field Office). Day-Lewis was foreclosed from participation in the quarterly Peer Mediation sessions (sometimes led by Locke, Folino or Smith), except for once when Day-Lewis and Bean were allowed to listen only, while those present in Philadelphia actively participated. Day-Lewis did not have opportunities for professional exposure available to Locke. In April 2011, Locke participated as faculty in the PBI 2011 Employment Law

Institute on employment mediation. Goldman's misrepresentations and omissions obstructed Day-Lewis from receiving the advantages Locke received.

Goldman Manipulates Job Classifications and Uses Special Appointment Authority to Pre-Select Marino to be ADR Coordinator

111.    Within days of Day-Lewis' arrival in Baltimore, Braverman retired as Deputy Director. Goldman applied for the position and was appointed Deputy Director early in 2009. Goldman continued to fulfill the ADR Coordinator duties along with his Deputy Director duties until December 2009.

112.    In September 2009, Goldman posted to fill the ADR Coordinator vacancy – the position he had previously held. Goldman manipulated the vacancy posting and selection process to enable Marino to be selected for ADR Coordinator, when in the absence of such manipulation, Marino would not have met the minimum qualifications as set forth in the ADR Coordinator Position Description.

113.    Instead of posting the ADR Coordinator position under its designated 0301 Administrative series and job title, Goldman posted the position under the 905 Attorney series and Supervisory Attorney job title. This change allowed Goldman to circumvent the job duties and requirements of the ADR Coordinator Position Description, in effect, making those duties and qualifications disappear for purposes of the job posting.

114.    In accordance with Day-Lewis' information and belief, Marino does not mediate, although having the ability to mediate the most complex cases, mediating 10% -25% or more of the production expectations of ADR Mediators and having the ability to train and mentor mediators are among the job duties of ADR Coordinator.

115.    Further, because the vacancy occurred in the Attorney Series, Goldman circumvented competitive selection and posted the job in the Excepted Service.

116.    An Excepted Service designation is a special appointment authority that enables federal agencies to use a streamlined hiring process for positions whereby it is not practicable to apply the qualifications and standards of the competitive service.

117.    Attorney positions fall in the Excepted Service category, while Supervisory ADR Mediator/ADR Coordinator positions fall in the Competitive Service category. OPM had not designated Supervisory ADR Mediator/ADR Coordinator as an Excepted Service position deeming it impracticable to distinguish among candidates by the qualifications and standards of the Competitive Service.

118.    Goldman misused a special appointing authority to enable Marino to qualify for a position for which she would not have qualified had she been required to compete. Marino, as the pre-selected candidate, not only was not required to meet the qualifications of the ADR Coordinator position description, but also was not required to be the highest ranked Supervisory Attorney candidate.

119.    Goldman misused the Excepted Service appointment authority to circumvent fair and open competition and to justify his pre-selection of Marino for the Supervisory ADR Mediator position.

120.    Goldman prevaricated when he told Day-Lewis and Bean that the vacancy would be posted under both Supervisory Attorney and ADR Coordinator job titles. The ADR Coordinator job posting in the competitive service never materialized.

Goldman's Actions Contravened Day-Lewis' Right to Fair and Open Competition and Created A Glass Ceiling and A Glass Wall for Day-Lewis

121.    Day-Lewis met all the qualifications of the ADR Coordinator Position Description. In the absence of Goldman's manipulation of the job series, job title, appointment authority, and job qualification questionnaire, Marino would not have met the minimum

23

qualifications for ADR Coordinator and thus would not have qualified to compete against Day-Lewis.

122.    By posting the ADR Coordinator vacancy as a Supervisory Attorney vacancy, Goldman favored Marino at Day-Lewis' expense, and thus sidestepped public policy requiring equal and fair opportunity for advancement solely on the basis of relative ability, knowledge, and skills of the job.

123.    Goldman's actions were particularly damaging to Day-Lewis.    Goldman confiscated a **rarely** occurring GS-14 job in the 0301 Administrative series that closely fit Day-Lewis' dual expertise and converted it to the 905 Attorney series that already had abundant GS-14 opportunities.  In effect, Goldman gave Marino even more advantages than she already had, and cut-off any and all upward mobility available within the Commission to Day-Lewis.

124.    Goldman provided Marino an easy path to GS-14 and facilitated an entryway for Marino to advance to Grade 15 as well as further into the Senior Executive Service.

125.    Goldman dealt Day-Lewis a double disadvantage.  He not only took away a rare opportunity for Day-Lewis to reach a higher grade in the 0301 Administrative series, but also denied her entry to the Attorney job series.  Obtaining appointment in the Attorney job series would have provided Day-Lewis with more opportunities to move laterally to other positions within the Commission and advance to higher grades, including the Senior Executive Service.

126.    Further, in February 2010 Day-Lewis applied for the Pittsburgh Trial Attorney vacancy. Neither Debra Lawrence nor Goldman spoke to Day-Lewis concerning her interest in the Trial Attorney position.

Goldman Favored the Younger Female with Sex Appeal

127.    In accordance with Day-Lewis' information and belief, Marino is significantly younger than Day-Lewis.

128.    The age difference and Day-Lewis' dress, overall appearance and sex appeal contrast with Marino.

The Succession Plan -- Keep the Management Team All or Virtually All Caucasian

129.    During Day-Lewis' time in the Philadelphia District, the management team was all or virtually all Caucasian, and included the following managers:  Marie Tomasso, District Director (Caucasian), Phil Goldman, Deputy Director (Caucasian), Debra Lawrence, Regional Attorney (Caucasian), Gerald Kiel, Director, Baltimore Field Office (Caucasian), Daniel Cabot, Director, Cleveland Field Office (Caucasian), William Cook, Enforcement Manager-Philadelphia, (Caucasian), Judy Cassell, Enforcement Manager-Baltimore (Caucasian), and Cynthia Stankiewicz, Enforcement Manager-Cleveland (Caucasian).

130.    Tomasso retired in January 2010, and Goldman aimed to succeed her.

131.    If Goldman had been successful in succeeding Tomasso as District Director, then he would have had significant input in selecting the next Deputy Director.

132.    Goldman preferred Marino and Locke as candidates for future advancement and gave them advantages at Day-Lewis' expense.  Despite Day-Lewis' superior qualifications, Goldman's course of conduct concerning Day-Lewis impeded any chance of her advancing within the Commission.

133.    Spencer Lewis, current Philadelphia District Director (and former New York District Director) (African-American) was appointed to replace Tomasso after Day-Lewis filed the first formal complaint (EEO No. 2010-00036).

Day-Lewis' Negative Interaction With Goldman Prompts Her to Question His Motives

25

134.    In early February 2010, Day-Lewis wrote a letter to Acting Chair Stuart J. Ishimaru ("Ishimaru") requesting his intervention in moving OFP to act on her pending Career Ladder Promotion recommendation.  Day-Lewis had not shared this information with Goldman.

135.    Unbeknownst to Day-Lewis, someone informed Goldman that Day-Lewis wrote Ishimaru.

136.    When Day-Lewis discovered the information referenced in Paragraph 57, Day-Lewis inquired of Goldman why she did not receive the same consideration after her appointment as the two attorneys received regarding their grade and compensation.  Goldman was irritated, curt and sharp with Day-Lewis, essentially telling her that since she was not an attorney she was not entitled to such consideration.

137.    Day-Lewis told Goldman she considered the treatment she had received over the last year to be unjust, including his unwillingness to do anything to address the unfairness.

138.    Goldman's irritated and sharp reaction prompted Day-Lewis' suspicions regarding Goldman's personnel decisions, and she began to suspect that her civil rights were being violated.  Day-Lewis began inquiries for legal consultation with employment attorneys.

139.    After Day-Lewis had a verbal commitment of representation from Mallon & McCool, Attorneys at Law, she made contact with the Office of Equal Opportunity ("OEO") to initiate the discrimination complaint process.

140.    Anticipating a lengthy civil rights process, Day-Lewis sought to maximize her potential earnings and thus mitigate her damages.

141.    In this same time period, Day-Lewis worked with Regina Andrew ("Andrew"), American Federation of Government Employees (AFGE) Local 3614 President on the narrow issue of obtaining OFP action on pending Career Ladder Promotions for Mediators.

142.    Andrew did not represent Day-Lewis in her discrimination complaint.

143.    Day-Lewis considers her discrimination complaint to be a factually complex matter focusing primarily on her grade and compensation at appointment that involved deception, unequal pay for equal work, unauthorized selection preferences, and unequal terms and conditions of employment.

144.    Compensation issues and prohibited personnel practices are foreclosed from disposition in the union grievance process therefore Day-Lewis had no intention of raising these claims in the context of a union grievance. Day-Lewis intended to pursue her statutory rights concerning these matters represented by Mallon & McCool, Attorneys at Law.

Defendant's Agents Put In Motion A Strategy of Corrupting Day-Lewis' Complaint Process, and Engaging in Antagonistic Action And Oppressive Reprisal To Stop Day-Lewis From Complaining About Her Compensation and Other Civil Rights Violations

145.    Upon information and belief, Inzeo was aware of Day-Lewis' letter to Ishimaru.

146.    Upon information and belief, Joanne Riggs informed Inzeo to anticipate a grievance from AFGE Local 3614 on behalf of ADR Mediators.

147.    Upon information and belief, Inzeo's office received the Step 1 Grievance on Career Ladder Promotions on behalf of GS-12 ADR Mediators filed by Andrew with Day-Lewis as class representative (the "Step 1 Class Grievance"), approximately one hour before Erica White-Dunston, Acting Assistant Director of OEO called Day-Lewis to conduct the initial telephone interview in response to Day-Lewis' contact with OEO days before. This interview lasted approximately 90 minutes. Day-Lewis subsequently had contact with EEOC Counselor Sabrina Carraway ("Carraway").

148.    Inzeo did not respond to the Union's Step 1 Class Grievance.

149.   Defendant's agents (including OEO employees) engaged in a course of conduct that undermined the integrity of her informal process from her initial contact. The misdeeds include, but are not limited to 1) intentionally misidentifying the claims in the initial Counseling letter dated March 15, 2010; 2) Carraway willfully imparting erroneous information to Day-Lewis; 3) Carraway willfully and repeatedly misunderstanding Day-Lewis' claims and resisting correction of her misperceptions; and 4) Erica White-Dunston involving Inzeo in the settlement negotiations with Day-Lewis.

150.   Inzeo's involvement in the attempt to resolve Day-Lewis' discrimination complaint exposed Day-Lewis to subsequent retaliation for refusing Inzeo's settlement offer and moving forward with filing a formal complaint.

151.   Day-Lewis distrusted Carraway because, including but not limited to, Day-Lewis discovered Carraway gave her erroneous information about the District Director's discretion regarding vacancies and the Commission's authority to give a new appointee credit for non-federal employment for purposes of accruing annual leave.

152.   Defendant's agents (including OEO employees) engaged in a course of conduct that undermined the fairness and trustworthiness of the formal complaint process.   The misconduct includes 1) deliberately prevaricating about the issues discussed during the counseling period; 2) falsifying the Counselor's Report of Inquiry; 3) failing to provide Day-Lewis and her attorney representative with the Counselor's Report of Inquiry in violation of 29 C.F.R. §1614.105(c); and 4) failing to serve Day-Lewis' legal representative the Dismissal Notice in violation of 29 C.F.R. §1614.605(d).

153.   Carraway, the EEOC Counselor who drafted the Report of Inquiry, failed to disclose that Erica White-Dunston, not Carraway, conducted the interview with Day-Lewis and

therefore was unaware of everything Day-Lewis discussed with Erica White-Dunston. Carraway intentionally distorted and prevaricated concerning Carraway and Day-Lewis' conversation concerning the union grievance. Carraway knew about the union grievance from the beginning of their contact. Day-Lewis clearly articulated to Carraway that the issues were distinct and unrelated. Carraway claimed Day-Lewis had not raised the issue of not receiving credit for her non-federal service during counseling, despite email evidence that Day-Lewis raised the issue with Carraway during the counseling period.

154. Day-Lewis' attorney representative and Day-Lewis should have received the Counselor's Report of Inquiry within 15 days of the Agency's receipt of the formal complaint. Day-Lewis and her attorney did not receive a copy of the Counselor's Report of Inquiry until August 2011 (more than **fifteen months** after she filed the formal complaint), when she received Defendant's brief in opposition to Day-Lewis' brief in support of her appeal to OFO, submitted **nine months** after Day-Lewis submitted her brief. The Agency's deadline for submitting the brief in opposition was 30 days.

155. Defendant's agents dismissed Day-Lewis' complaint (EEO No. 2010-00036) in its entirety by, including but not limited to, fragmenting the allegations to dilute the integrity and coherence of the whole in contravention to Defendant's Management Directive 110, Chapter 5 §III.

156. Defendant dismissed Day-Lewis' complaint in retaliation for (1) requesting Acting Chair Ishimaru's intervention concerning the Career Ladder Promotion; (2) refusing Inzeo's proposal of settlement of EEO No. 2010-00036; (3) participating as representative class grievant in the Step 2 Grievance with Chair Jacqueline A. Berrien concerning the Career Ladder Promotion for Mediators; (4) obtaining Career Ladder Promotion from Chair Berrien in

settlement of the Step 2 Grievance concerning Career Ladder Promotion for Mediators; and (5) filing formal complaint EEO No. 2010-00036 under the Equal Pay Act of 1963, Title VII of the Civil Rights Act of 1964, the Lily Ledbetter Fair Pay Act of 2009, and the Age Discrimination in Employment Act.

157.   Defendant's agents, including Reuben Daniels ("Daniels") (African-American, male) District Director of the Charlotte District Office, engaged in additional retaliatory conduct in violation of the aforementioned statutes by subjecting Day-Lewis to continuous antagonistic actions, including actions to undermine and downgrade her performance ratings and the performance ratings of her colleague mediator Vanessa Maulet for FY 2010 and FY 2011.

158.   Within days of Day-Lewis' arrival in the Raleigh Area Office, Daniels created an artifice of granting Day-Lewis a 4/10 schedule, knowing it was not allowed in the Raleigh Area Office.

159.   After Day-Lewis had worked the schedule for a few weeks, Daniels revoked the 4/10 schedule.

160.   In November 2010, Daniels intentionally miscalculated Day-Lewis' FY2010 performance rating and did not complete her rating of record for the entire performance period.

161.   Despite being repeatedly informed by Day-Lewis and the Office of Human Resources that his actions concerning Day-Lewis' performance rating contravened Commission policy and federal regulations as set forth in EEOC Order 540.008 dated November 1, 2005 Employee Performance Evaluation System Handbook, Daniels did not make the required corrections until late April 2011, five months after Day-Lewis complained.

162.    These antagonistic and arbitrary actions continued when Day-Lewis attempted to obtain lawful and neutral processing of her allegations of discrimination through the Office of Special Counsel.

163.    Daniels attempted to undermine Day-Lewis' performance rating for FY 2011 (and the performance rating of Vanessa Maulet) by controlling the Raleigh Mediation Unit's inventory, instructing the Acting ADR Coordinator to give Day-Lewis' Greensboro work-product to other mediators despite her complaints that she needed cases, and then blaming Day-Lewis for "being out of alignment" with the Director's Mediation Unit merit resolution goals.

164.    Daniels denied Day-Lewis a professional development opportunity to conduct even one federal sector mediation, despite one of the parties requesting her as the mediator.

165.    Daniels denied Day-Lewis an opportunity to engage in an outside employment opportunity that did not conflict with her official duties in the days leading up to the potential shut-down of the federal government in April 2011.

166.    Defendant's agents continued to antagonize Day-Lewis and corrupt her discrimination complaint process by assigning Carraway to be the Investigator of her second formal complaint (EEO No. 2011-33814) even though OEO was on notice that Day-Lewis had accused Carraway of misconduct as the counselor in her first formal complaint (EEO No. 2010-00036).

167.    Despite Day-Lewis' written objection to Carraway, Carraway was still permitted to issue the Report of Investigation.  This report was issued without Day-Lewis' Affidavit claiming the office had not received it as of January 18, 2012.

168.    The claim of non-receipt of the Affidavit is unworthy of belief since the Affidavit was sent by U.S. Postal Service first class mail on Tuesday, January 10, 2012.  Carraway's mendacity about other matters relating to Day-Lewis' claims is referenced above.

Goldman and Daniels' Willful Neglect Regarding Day-Lewis' Professional Development

169.    Day-Lewis informed Goldman of her goal to do federal sector mediations and to be ADR Coordinator in her FY2009 Individual Development Plan.

170.    Day-Lewis informed Daniels of her attorney experience, her arbitration experience, and her desire to continue expanding her experience in ADR when she requested permission to engage in outside employment opportunities that did not conflict with her official duties.

171.    Goldman and Daniels were aware of Day-Lewis' ability and willingness to exceed expectations to contribute to the respective Directors' customer service, completed work product and operational effectiveness goals.

172.    Upon information and belief, Goldman and Daniels have obligations under federal personnel management policy to provide professional development opportunities to the employees under their authority.

173.    Despite Goldman and Daniels' awareness of Day-Lewis' ambitions and her demonstrated ability to exceed expectations, they acted in ways to negatively impact Day-Lewis' earning and promotion potential.

174.    Goldman's conduct has been set forth in the paragraphs above.

175.    Daniels demonstrated disregard for Day-Lewis' professional development when he denied her the opportunity to do even one federal sector mediation.

32

176. Daniels demonstrated disregard for Day-Lewis' earning potential when he denied her the opportunity to accept an outside employment opportunity that did not conflict with her official duties, during a period when federal employees faced the real possibility of a government shutdown.

177. Daniels' actions toward Day-Lewis contrast with the latitude he gave Larry Ross (African American male) to conduct federal sector mediations and to accept outside employment opportunities.

178. Upon information and belief, Goldman and Daniels acted with willful disregard of Day-Lewis' demonstrated professional ambitions and abilities, to negatively impact her mobility and earnings because they assumed Day-Lewis should be satisfied with having a federal job as a mediator, and would settle for that position for the remainder of her work life.

179. Upon information and belief, Goldman and Daniels' assumptions about Day-Lewis' promotion and earning potential were not based on her knowledge, skills and abilities, but were based on her membership in one or more protected classes.

180. Upon information and belief, Goldman and Daniels assumed they could negatively impact Day-Lewis' earning and promotion potential with impunity because her membership in one or more protected classes diminished her marketability, thus causing her to be too vulnerable and fearful to persistently complain, especially after experiencing oppressive retaliation.

## FIRST CAUSE OF ACTION - RACIAL DISCRIMINATION PURSUANT TO THE CIVIL RIGHTS ACTS OF 1964 AND 1991 (PRETEXT OR MIXED MOTIVE) (42.U.S.C. 2000e *et seq.*)

181. Day-Lewis repeats and re-alleges each of the allegations contained in paragraphs 1 through 180 as if fully set forth herein.

182. Day-Lewis is a member of a protected class because she is African-American.

183. Day-Lewis was qualified through her advanced education, training and extensive mediator experience to be categorized at the GS-13 or higher when she applied for and accepted the ADR Mediator GS-12 position with the Defendant in 2008.

184. Defendant engaged in the following adverse employment actions with respect to Day-Lewis during the time she was employed with Defendant including, but not limited to:

    a. Failing to classify Day-Lewis as a GS-13 ADR Mediator instead of a GS-12 ADR Mediator when 1) Day-Lewis was fully qualified to be classified as a GS-13 ADR Mediator; 2) Day-Lewis performed the same or substantially the same duties as other ADR Mediators in the Philadelphia District; and 3) Defendant classified two Caucasian employees (Locke and Folino) as GS-13 ADR Mediators;

    b. Failing to use special pay-setting authority to mitigate the pay discrepancy between Day-Lewis and the other ADR Mediators in the Philadelphia District as 1) Day-Lewis performed the same or substantially the same duties as the other ADR Mediators; 2) the other ADR Mediators were compensated at higher rates of pay; and 3) all but two of the other ADR Mediators were Caucasian;

    c. Failing to allow Day-Lewis to accrue annual leave at a level higher than the entry level of four hours per pay period even though federal law authorized Day-Lewis to accrue annual leave at a higher level given her extensive, prior related work experience;

    d. Misrepresenting to Day-Lewis at the time of her hire regarding whether there were any GS-13 ADR Mediator vacancies in Philadelphia and misleading Day-Lewis to believe that no such position existed at that time in Philadelphia, thereby

preventing Day-Lewis from applying for the vacant GS-13 ADR Mediator position (for which she was qualified) that in fact existed and was awarded to a pre-selected, less experienced Caucasian woman;

e. Requesting Day-Lewis as well as another African American mediator in the Baltimore office to substantially increase their respective mediation workloads while not requiring the same from other similarly situated, ADR Mediators outside of the protected class;

f. Refusing to hire Day-Lewis in the GS-14 Supervisor General Attorney position (*de facto* Philadelphia District ADR Coordinator position) even though Day-Lewis was better qualified for the position than the Caucasian female attorney Defendant hired, who possessed no mediator experience; and

g. Such other adverse employment actions that are otherwise alleged in this Complaint and/or may be determined through the discovery process.

185.   Defendant's membership in the protected class (African American race) was either the determining factor or a motivating factor in Defendant's perpetration of said adverse employment actions against Day-Lewis in light of including, but not limited to, the following acts and/or omissions of Defendant:

a. Goldman, Defendant's agent, through his professional contact and experience with Day-Lewis for several years, knew that Day-Lewis was not a novice mediator but was instead an experienced, senior-level mediator;

b. Goldman represented to Day-Lewis that he had no authority to appoint Day-Lewis ADR Mediator GS-13, even though he had the authority to do so and had done so for two Caucasian employees (Locke and Folino);

35

c.  Goldman deceived Day-Lewis concerning the ADR Mediator GS-12 position. He represented to Day-Lewis that he believed the GS-12 classification for Day-Lewis' position to be temporary, which led Day-Lewis to believe ADR Mediator had been temporarily downgraded and would be upgraded after the compensation study, and Day-Lewis relied to her detriment on this misrepresentation;

d.  Goldman represented to Day-Lewis that her advanced education, qualifications and experience were not requirements for the ADR Mediator GS-12 therefore, she was not entitled to be classified GS-13 at the time of her appointment;

e.  Notwithstanding this representation, Goldman made no effort to appoint Day-Lewis GS-13 even though he had the authority to do so and had done so for Caucasian employees;

f.  Goldman failed to inform Day-Lewis at the time of her acceptance of the ADR Mediator GS-12 position that the position was "Non-Career Ladder," meaning there was no promotion potential to GS-13;

g.  Goldman failed to provide Day-Lewis with certain required, federal documents that contradicted the representations he made to Day-Lewis during the Job Offer Conversation;

h.  After Day-Lewis accepted the ADR Mediator GS-12 position, one Caucasian male who applied for ADR Mediator GS-12 position was appointed to ADR Mediator GS-13;

i.  After Day-Lewis accepted the ADR Mediator GS-12 position, Goldman selected two inexperienced Caucasian women (Locke and Marino) for ADR Mediator and/or Supervisory ADR Mediator positions at GS-13 and GS-14 respectively,

and Day-Lewis had substantially more mediator experience than both Caucasian women;

j. Goldman represented that no ADR Mediator GS-13 vacancies were anticipated in Philadelphia even though such an ADR Mediator GS-13 vacancy was posted within a week of Day-Lewis' hire, and Defendant immediately filled the position with an inexperienced Caucasian female (Locke);

k. Goldman pushed Day-Lewis and her African American colleague to perform substantially more mediations while he simultaneously ensured a lighter workload for two Caucasian female mediators in the Philadelphia office;

l. Goldman's pre-selection of Locke (an inexperienced Caucasian woman) for the Philadelphia ADR Mediator Position GS-13 was inconsistent with the policies contained in the Merit System Principles;

m. Goldman posted the 2009 ADR Coordinator (0301 Administrative Series), a "Competitive Service" position as a Supervisory General Attorney position in the "Excepted Service" when this was not authorized by the Office of Personnel Management, which enabled a young, inexperienced Caucasian woman, pre-selected by Goldman, to be awarded the position even though Day-Lewis was qualified for, applied for and was denied the position;

n. Day-Lewis applied for and was qualified for the Pittsburgh Trial Attorney vacancy in February 2010, however, no one at the Commission ever spoke to Day-Lewis about this position; and

o. Such other facts that support racial discrimination as the determinative factor or motivating factor for Defendant's acts or omissions as otherwise alleged in this Complaint and/or that may be determined through the discovery process.

186. As a result of Defendant's adverse employment actions perpetrated upon Day-Lewis with Day-Lewis' membership in the protected class utilized as a determinative or motivating factor, Day-Lewis has suffered, including but not limited to the following actual injuries and/or damages: decreased compensation; less desirable job assignment; less desirable duty station; fewer lateral transfer opportunities; fewer advancement opportunities; and lessened opportunities to participate in peer mediation activities, to conduct federal sector mediations and to engage in opportunities to be course planner and faculty in PBI Employment Law Institute continuing legal education events. In addition, in reliance on Defendant's misrepresentations, Day-Lewis resigned from FEMA's ADR Cadre before she had an opportunity to start, withdrew from consideration for the Princeton Ombudsman position, and withdrew from consideration for senior level positions with two religious organizations.

## SECOND CAUSE OF ACTION – GENDER DISCRIMINATION PURSUANT TO THE CIVIL RIGHTS ACTS OF 1964 AND 1991 (PRETEXT OR MIXED MOTIVE) (42.U.S.C. 2000e *et seq.*)

187. Day-Lewis repeats and re-alleges each of the allegations contained in paragraphs 1 through 186 as if fully set forth herein.

188. Day-Lewis is a member of the protected class of sex because she is a female.

189. Defendant engaged in the following adverse employment actions with respect to Day-Lewis during the time she was employed with Defendant including, but not limited to:

a. Inzeo, as an agent of Defendant, approved the appointment of Brian Nelson to ADR Mediator GS-13, despite him being a novice;

38

b.  Inzeo, as agent of Defendant, approved the appointment of Day-Lewis to ADR Mediator GS-12, despite her being an expert;

c.  Daniels, as an agent of Defendant, allowed Larry Ross, fellow male ADR Mediator in the Charlotte District to conduct federal sector mediations and perform outside mediations, which enhanced his professional development as well as his income-earning potential post-retirement;

d.  Although Daniels assisted Ross, Daniels failed to provide Day-Lewis with federal sector mediations and other opportunities which would have enhanced her professional development as well as her income-earning potential post-retirement;

e.  Ross' job classification, grade and benefits were more advantageous than Day-Lewis' job classification, grade and benefits.

f.  Daniels removed mediations assigned to be performed by Day-Lewis and reassigned them to be performed by other mediators and, at the same time, admonished Day-Lewis that she might not meet Commission production goals, thus, setting Day-Lewis up for a poor annual performance evaluation.

190. Defendant's membership in a protected class (female) was either the determining factor or a motivating factor in Defendant's perpetration of said adverse employment actions against Day-Lewis because there is no reasonable explanation, other than Day-Lewis' membership in the protected class of sex (female) for the aforementioned adverse employment actions.

191. As a result of Defendant's adverse employment actions perpetrated upon Day-Lewis with Day-Lewis' membership in the protected class utilized as a determinative or motivating factor, Day-Lewis has suffered including but not limited to the following actual

injuries and/or damages: decreased compensation; less desirable job assignment; fewer lateral transfer opportunities; fewer advancement opportunities; and lessened opportunities to conduct federal sector mediations and to engage in outside employment opportunities.

## THIRD CAUSE OF ACTION – UNEQUAL PAY CLAIM PURSUANT TO THE EQUAL PAY ACT OF 1963 (29 U.S.C. § 206 *et seq.*)

192.    Day-Lewis repeats and re-alleges each of the allegations contained in paragraphs 1 through 191 as if fully set forth herein.

193.    Goldman, as agent of the Commission and utilizing the delegating authority of Tomasso, employed Day-Lewis, and supervised male ADR Mediators with the Commission, including but not limited to Smith and Joel Pretz.

194.    Day-Lewis was hired as a GS-12 ADR Mediator rather than a GS-13 ADR Mediator and was not promoted to GS-13 ADR Mediator by the Commission until she transferred to the Charlotte District.

195.    Smith and Pretz were employed as a GS-13 ADR Mediators.

196.    Both Smith and Pretz performed the same work as Day-Lewis, and all three of the respective jobs required substantially equal skill, effort and responsibility.

197.    The jobs of Smith, Pretz and Day-Lewis were performed under similar working conditions.

198.    At the time of her appointment and thereafter, Day-Lewis was classified at a lower grade and was paid a substantially lower wage rate for substantially equal work to that performed by Smith and Pretz in their respective positions.

199.    After being transferred to the Commission's Raleigh Area Office, Day-Lewis continued to perform the job duties of ADR Mediator and was finally classified as ADR Mediator GS-13.

200.    While in the Charlotte District, Ross worked as a GS-13 ADR Mediator and performed the same job as Day-Lewis requiring substantially equal skill, effort and responsibility.

201.    Ross and Day-Lewis performed their jobs under similar working conditions.

202.    At the time of her transfer Day-Lewis received a substantially lower rate for substantially equal work to that performed by Ross.

203.    As a result of the aforementioned actions of the Commission, Day-Lewis has been damaged and demands back pay, front pay and any other general compensatory damages to cure the inequities between the pay of Day-Lewis and Smith, and Day-Lewis and Pretz, and Day-Lewis and Ross.

### FOURTH CAUSE OF ACTION - AGE DISCRIMINATION (DISPARATE TREATMENT) PURSUANT TO THE AGE DISCRIMINATION IN EMPLOYMENT ACT OF 1967 (29 U.S.C. § 621 *et seq.*)

204.    Day-Lewis repeats and re-alleges each of the allegations contained in paragraphs 1 through 203 as if fully set forth herein.

205.    In September 2009, Day-Lewis was over 40 years of age (a member of the protected class) and was employed with Defendant as a GS-12 ADR Mediator.

206.    In September 2009, there existed a vacancy for the position of Philadelphia District ADR Coordinator with the Defendant.

207.    Defendant posted the position of Philadelphia District ADR Coordinator in the excepted service GS-14 Supervisory General Attorney class as opposed to the competitive service GS-14 ADR Coordinator.

208.   Day-Lewis qualified for both positions – GS-14 Supervisory General Attorney and GS-14 ADR Coordinator - and formally applied for the GS-14 Supervisor General Attorney position.

209.   Day-Lewis was subject to an adverse employment practice because the position was not awarded to Day-Lewis, but was instead awarded to a younger Caucasian female who did not possess any prior mediator experience.

210.   As a result of the position being awarded to the younger, Caucasian female who possessed no prior mediator experience, the young woman became Day-Lewis's direct supervisor.

211.   Age was a determinative or motivating factor in awarding the position to the younger female instead of Day-Lewis because including, but not limited to:

    a.   The younger woman was not qualified to mediate cases (a requirement of the position);

    b.   The younger woman was not qualified to supervise experienced mediators;

    c.   Excepted service special appointment authority was misused to enable the younger woman to minimally qualify for a position she would not have qualified for in the absence of such misuse of special appointment authority.

    d.   Day-Lewis was more qualified for the position then the younger Caucasian female; and

    e.   Any other facts or circumstances as may be discovered or determined through the discovery process.

212.   As a result of Defendant's utilization of age as a determinative or motivating factor in the awarding of the position to the younger female instead of Day-Lewis, Day-Lewis

has suffered including, but not limited to, the following actual injuries and/or damages: decreased compensation; less desirable job assignment; less desirable duty station; fewer lateral transfer opportunities; fewer advancement opportunities; and lessened opportunities to participate in peer mediation activities, to conduct federal sector mediations and to engage in opportunities to be course planner and faculty in PBI Employment Law Institute continuing legal education events.

### FIFTH CAUSE OF ACTION - AGE DISCRIMINATION (DISPARATE IMPACT) PURSUANT TO THE AGE DISCRIMINATION IN EMPLOYMENT ACT OF 1967 AND AMENDMENTS (29 U.S.C. § 621 *et seq.*)

213. Day-Lewis repeats and re-alleges each of the allegations contained in paragraphs 1 through 212 as if fully set forth herein.

214. Upon information and belief, between December 2008 and December 2011, Defendant hired numerous new ADR Mediators from outside the Commission.

215. Upon information and belief, the majority of the mediators hired (if not virtually all of them) were over 40 and, thus, members of Day-Lewis' protected class.

216. Upon information and belief, at least some of the mediators hired by Defendant from December 2008 through December 2011, who were members of the protected class, were expert mediators and also classified as GS-12 ADR Mediators instead of GS-13 ADR Mediators.

217. If Defendant's job grade classification and pay-setting criteria are deemed facially neutral employment practices, then said practices had a significantly disproportionate adverse impact on people who are members of the protected class including Day-Lewis.

### SIXTH CAUSE OF ACTION – RETALIATION PURSANT TO THE CIVIL RIGHTS ACTS OF 1964 AND 1991, THE AGE DISCRIMINATION IN EMPLOYMENT ACT OF 1967, THE FAIR LABOR STANDARDS ACT OF 1938, AND THE EQUAL PAY ACT OF 1963 (42.U.S.C. 2000e *et seq.*; 29 U.S.C. § 621 *et seq.*; 29 U.S.C. 201 *et. seq.*)

218.    Plaintiff repeats and re-alleges each of the allegations contained in Paragraphs 1 through 217 above as though fully set forth herein.

219.    Day-Lewis, in good faith, engaged in federally protected activities including, but not limited to:

a.    Complaining to Defendant formally and informally regarding her job classification, grade and compensation;

b.    Writing a letter to Acting Chair Ishimaru requesting his intervention in moving OFP to act on her pending Career Ladder Promotion recommendation;

c.    Working with Regina Andrew, AFGE Local 3614 President on obtaining OFP action on pending Career ladder Promotions for Mediators, which involved filing and pursuing Steps 1 and 2 Grievances concerning Career Ladder Promotion for Mediators;

d.    Filing and pursuing complaint EEO No. 2010-00036 and EEO No. 2011-33814, which involved claims under the Equal Pay Act, Title VII, the Lilly Ledbetter Fair Pay Act of 2009 and the ADEA;

e.    Refusing Inzeo's proposal of settlement of EEO No. 2010-00036; and

f.    Such other protected activities engaged in by Day-Lewis that may elsewhere be alleged in this Complaint.

220.    Upon information and belief, Inzeo was aware of Day-Lewis' letter to Ishimaru.

221.    Upon information and belief, Inzeo was aware of a grievance being filed by the American Federation of Government Employees (AFGE) with Day-Lewis serving as the representative class grievant on behalf of GS-12 ADR Mediators.

222.    Upon information and belief, Inzeo was aware of EEO No. 2010-00036.

44

223.    As a result of her engaging in the aforementioned protected activities in good faith, Day-Lewis was subjected to the following materially adverse actions at the time of and/or or after said activities took place:

a.  Upon information and belief, Inzeo sought to manipulate dismissal of any formal complaint Day-Lewis may file by engaging the assistance of Erica White-Dunston and Sabrina Carraway to mischaracterize Day-Lewis' claims as "repeatedly denied a pay increase," making it seem that Day-Lewis' civil rights complaint was the same matter as the AFGE Local 3614 Step 1 Grievance on Career Ladder Promotions, that she elected to pursue this matter by the Negotiated Grievance Procedure, and was foreclosed from invoking the statutory procedures;

b.  Upon information and belief, Inzeo sought to discourage Day-Lewis from going further than the counseling stage in the discrimination complaint process by engaging the assistance of Sabrina Carraway to misinform Day-Lewis concerning hiring guidance and credit for non-federal service;

c.  When Day-Lewis refused Inzeo's proposal to settle the discrimination complaint, upon information and belief, Inzeo sought to punish Day-Lewis for her refusal, for being the class representative for the AFGE Local 3614 Step 2 Class Grievance on Career Ladder Promotion for Mediators, and for filing a formal complaint;

d.  Upon information and belief, Inzeo engaged Carraway's assistance to defeat Day-Lewis' formal complaint, and Carraway obliged by falsifying the Counselor's Report of Inquiry, misrepresenting the matters that were disclosed during the

counseling period, and failing to deliver the Report of Inquiry to Day-Lewis and her then legal counsel;

e.  Inzeo is Reuben Daniels' supervisor, and Mr. Daniels' became Day-Lewis' *de facto* supervisor upon her transfer to the Charlotte District;

f.  Upon information and belief, Inzeo or his designee informed Daniels of Day-Lewis' protected activity at some time after Daniels accepted Day-Lewis as a transfer to the Charlotte District;

g.  Daniels subjected Day-Lewis (and her colleague mediator, Vanessa Maulet because of her association with Day-Lewis) to materially adverse employment actions within days of Day-Lewis' arrival including, but not limited to:

   i.   Creating the illusion of granting Day-Lewis and Maulet 4/10 compressed schedules, and then shortly thereafter revoking the authorized compressed schedules;

   ii.  Arbitrarily lowering Day-Lewis' and Maulet's 2010 performance ratings; and

   iii. Taking actions to undermine Day-Lewis and Maulet's production in 2011 in order to justify lowered performance ratings for 2011.

h.  Any and all other materially adverse actions otherwise alleged in this Complaint and/or may be uncovered through the discovery process.

224.  There was a causal connection between Defendant's materially adverse actions and Day-Lewis' protected activities because including, but not limited to, Defendant's antagonistic course of conduct against Day-Lewis began within days of Day-Lewis arrival in the

Charlotte District, e.g., Daniels' revoked Day-Lewis' 4/10 compressed schedule within days of Day-Lewis' transfer.

225.    Day-Lewis suffered damages as a result of Defendant's retaliation against her for engaging in protected activities including, but not limited to: undeserved lower performance rating and absence of a rating of record for FY 2010 which adversely impacted her ability to apply for lateral and promotion opportunities outside the Commission for a five month period, emotional and physical exhaustion from using her off-duty time to counter the retaliation, constant physical pain in the neck and shoulders, headaches caused by chronic muscle tension, as well as pain and suffering and loss of enjoyment of life.  In addition, as a result of Defendant's retaliation, sought and obtained a position outside of the Commission, something she would not have done but for Defendant's oppressive discriminatory and retaliatory conduct.  In her new federal employee position outside of the Commission, Day-Lewis continues to be adversely impacted and damaged in her job grade, compensation and benefits as a result of Defendant's discriminatory and retaliatory conduct.

## PRAYER FOR RELIEF

Wherefore, Day-Lewis respectfully requests that this Court enter judgment in her favor against the Defendant on the above claims and provide her with the following relief:

1.    Enter a judgment for Day-Lewis as the prevailing party under Title VII of the Civil Rights Act of 1964 concerning Day-Lewis' classification at initial appointment.

2.    Enter a judgment for Day-Lewis as the prevailing party under Title VII of the Civil Rights Act of 1964 concerning Day-Lewis' compensation at initial appointment and compensation after her transfer.

3.   Enter a judgment for Day-Lewis as the prevailing party under Title VII of the Civil Rights Act of 1964 concerning Day-Lewis' terms and conditions of employment.

4.   Enter a judgment for Day-Lewis as the prevailing party under Title VII of the Civil Rights Act of 1964 concerning Day-Lewis' non-selection as ADR Coordinator/Supervisory ADR Mediator.

5.   Enter a judgment for Day-Lewis as the prevailing party under the Age Discrimination in Employment Act of 1967 concerning Day-Lewis' non-selection as ADR Coordinator/Supervisory ADR Mediator.

6.   Enter a judgment for Day-Lewis as the prevailing party under the Age Discrimination in Employment Act of 1967 concerning Day-Lewis' classification and compensation.

7.   Enter a judgment for Day-Lewis as the prevailing party under the Age Discrimination in Employment Act of 1967 concerning retaliation for engaging in protected activity.

8.   Enter a judgment for Day-Lewis as the prevailing party under the Equal Pay Act of 1963 concerning Day-Lewis' classification and compensation at initial appointment.

9.   Enter a judgment for Day-Lewis as the prevailing party under the Equal Pay Act of 1963 concerning retaliation for engaging in protected activity.

10.  Enter a finding that Defendant's agents violated the Merit System Principles and engaged in Prohibited Personnel Practices, and refer the Court record to the Office of Special Counsel to initiate proceedings against the offenders consistent with the Court's findings.

11. Enter an order for Defendant to pay Day-Lewis back pay with interest, including adjustments to retirement contributions, at GS-13 Step 2 (Baltimore-Washington Locality) from December 8, 2008 through November 30, 2009.

12. Enter an order for Defendant to pay Day-Lewis back pay with interest, including adjustments to retirement contributions, at GS-14 Step 1 (Philadelphia Locality) from December 1, 2009, and thereafter with interest at the rate of all attendant Step increases from December 1, 2010 to March 10, 2012.

13. Enter an order for Defendant to pay Day-Lewis front pay at GS-14 Step 3 and all attendant Step increases from March 11, 2012 through December 31, 2024.

14. Enter an order for Defendant to pay Day-Lewis back pay with interest for annual leave accrued at the rate of eight hours per pay period from December 8, 2008 to March 10, 2012.

15. Enter an order for Defendant to pay Day-Lewis front pay equivalent to annual leave accrual at the rate of eight hours per pay period from March 11, 2012 to December 31, 2024.

16. Enter an order for Defendant to amend Day-Lewis' official personnel file and performance evaluations to reflect the retroactive grade classifications and Step increases.

17. Enter an order for Defendant to pay Day-Lewis' reasonable attorney's fees (including fees incurred during the administrative proceeding), and all costs and expenses of the administrative and court actions.

18. Enter an order for Defendant to pay Day-Lewis compensatory damages for diminishment of her professional and social networks in Philadelphia due to the loss of opportunities to return because of Defendant's actions.

19. Enter an order for Defendant to pay Day-Lewis compensatory damages for moving expenses and increased housing expenses because of Defendant's actions.

20. Enter an order for Defendant to pay Day-Lewis compensatory damages for loss of job opportunities, emotional and psychological exhaustion, physical damage and loss of enjoyment of life due to the retaliation by Defendant's agents.

## DEMAND FOR A TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Day-Lewis demands a trial by jury on all claims.

Respectfully submitted:

STEVEN N. GOUDSOUZIAN, LLC

Dated: May 14, 2012

Steven N. Goudsouzian, Esquire
P.A. Id No. 74831
2925 William Penn Highway, Suite 301
Easton, PA 18045
stevesnglaw@gmail.com
Phone: (610) 253-9171
*Attorney for Plaintiff, Kimberly Day-Lewis*